IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 113,368

In the Matter of TED E. KNOPP,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed December 2, 2016. Ninety-day suspension stayed, and respondent placed on 6 months' probation.

*Deborah L. Hughes*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the formal complaint for the petitioner.

*Monte A. Vines*, of Adams Jones Law Firm, P.A., of Wichita, argued the cause, and *Ted E. Knopp*, respondent, argued the cause pro se.

*Per Curiam*:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Ted E. Knopp, of Wichita, an attorney admitted to the practice of law in Kansas in 1982.

On May 15, 2014, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent timely filed an answer on July 30, 2014, after the granting of a motion to continue the date the answer was due. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on November 25, 2014, where the respondent was personally present and was represented by counsel. The hearing panel determined that respondent violated KRPC 3.1 (2015 Kan. Ct. R. Annot. 592) (meritorious claims and contentions); 3.3(a)(1) (2015 Kan. Ct. R. Annot.

1

601) (candor toward tribunal); 8.4(c) (2015 Kan. Ct. R. Annot. 672) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); 8.4(d) (engaging in conduct prejudicial to the administration of justice); and 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law).

Upon conclusion of the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"11.    In 2011, C.K. was living in a mobile home owned by her grandmother, D.G. D.G. had been disabled for many years. D.L., C.K.'s mother and D.G.'s daughter served as D.G.'s attorney-in-fact. D.L. never lived in the mobile home and D.G. has not lived in the mobile home since 2007.

"12.    The mobile home sat on a lot in a mobile home park owned by South Meridian Park, LLC (hereinafter 'South Meridian'). South Meridian was owned by J.J. C.K. leased the lot from South Meridian.

"13.    On April 4, 2011, C.K.'s rent was overdue. That day, South Meridian posted a 3-day notice to vacate on the door of the mobile home informing C.K. that she would be evicted if she did not pay $495 in overdue rent and fees within 3 days.

"14.    On April 6, 2011, C.K. left a partial payment of $400 in the park manager's deposit box. Unbeknownst to C.K., the park manager returned the partial payment to C.K. On April 7, 2011, C.K. delivered $95—the balance of rent and fees owed—to the manager's deposit box. When C.K. returned to the mobile home, she discovered that the park manager had returned the $400 partial payment with a note that provided, 'CHRISTINA HERE IS YOUR MONEY BACK FOR THE LOT RENT. WE

2

DO NOT WANT THE MONEY. WE JUST WANT YOU TO MOVE OUT OF THE PARK.'

"15. C.K. did not return the $400 back to the park manager after it was returned.

"16. On April 8, 2011, South Meridian filed an eviction petition against C.K. in Sedgwick County District Court. C.K. was personally served with the petition. C.K. failed to file an answer nor did she appear to defend the petition. On April 14, 2011, the district court entered a default judgment against C.K. Also on April 14, 2011, the court issued a writ of restitution restoring South Meridian to possession of the lot on which the mobile home sat.

"17. After the writ was issued, South Meridian changed the locks on the mobile home and posted a notice on the door advising C.K. that she was evicted and that the locks had been changed.

"18. Thereafter, C.K. and D.L. hired the respondent. On May 6, 2011, the respondent filed a motion to set aside the default judgment on behalf of C.K. and filed a motion to intervene in the eviction action on behalf of D.L. In the first motion, the respondent made the following representations:

'2. Plaintiff served on Defendant [C.K.] a three-day notice to vacate dated April 4, 2011, (Exhibit A). The three-day notice specified an amount past due of $495.00.

'3. Within three days ($400 on April 6 and $95 on April 7, 2011), Defendant delivered to Plaintiff the amount requested in the three-day notice.

'4. On April 7, 2011, after tender of rent, Defendant [C.K.]'s rent was returned to her by Plaintiff's Manager, [M.L.] by depositing an envelope in Defendant [C.K.]'s door with the money orders enclosed and

3

a letter stating "[C.K.] here is your money back for the lot rent. We do not want the money. We just want you to move out of the park." (See Exhibit B).

'5.     Notwithstanding the tender of the full rent due, Plaintiff filed a Petition for Eviction for failure to pay rent on April 8, 2011, and obtained judgment on that basis on April 14, 2011.

. . . .

'8.     The Journal Entry of Judgment was a fraud on the Court based on the original Petition alleging grounds for eviction of [*sic*] non-payment of rent based on the tender of the rent and the return [by] the Plaintiff of the rent tendered. The eviction petition is an attempt to avoid the statutory provisions for terminating a manufactured home rental arrangement.'

"19.     On May 16, 2011, the court held a hearing on the respondent's motions. The court addressed the status of the mobile home at that hearing. Kurt Holmes, counsel for South Meridian, repeatedly stated that his client had no objection to the mobile home being moved out of the park and that was what his client had wanted from the beginning. Mr. Holmes stated:

'[My] client has never wanted the mobile home, has been all along telling whoever the owner of it is, which has been in question, please move it and get it out of our park;

'[Defendants] have told her from day one that she can make any arrangements to move all of her personal property that's in the home out, and to date, she's not done that, and, so far, there's been no arrangements made to move the home;

4

'[M]y clients are here to give her every opportunity to move anything that she wants out of the house, and to make any—whoever owns the home to make any steps toward moving that home;

'And, again, we're not making any claim on the mobile home. We don't want the mobile home; and

'[M]y client and the manager are both here to make any arrangements with her. And to date, she has made no request to get anything out of that home, and they are both here to make whatever arrangements we can to get all personal property back to her.'

"20. Initially, the respondent took the position that his clients only wanted to get the mobile home. The district court granted a 2-week continuance so the respondent and Mr. Holmes could arrange for the respondent's clients to have access to the mobile home to retrieve personal belongings and to move it out of the park.

"21. After the 2-week continuance, the respondent changed his position and argued that D.G., the owner of the mobile home, was not a party to the eviction action, the mobile home should remain in South Meridian's mobile home park and that C.K. should be allowed to reside in it until South Meridian properly evicted D.G.

"22. The district court denied the respondent's motion to set aside the default judgment. The district court granted the motion to intervene, but held that the respondent should have to establish that the intervener had a landlord-tenant relationship with South Meridian before she would be allowed unlimited access to the mobile home. The district court set that issue for a hearing to be held on May 19, 2011. The district court made it clear that neither C.K. nor D.L. had the right to access the mobile home or its contents without obtaining South Meridian's consent.

"23. On May 18, 2011, the day before the hearing, D.L., acting on advice from the respondent, entered South Meridian's mobile home park without notice to or prior to approval from South Meridian. D.L. was accompanied by a locksmith, who

5

changed the locks on the mobile home. D.L. entered the mobile home and then called the police because she believed certain items of property were missing. C.K. arrived at the property and the police threatened to arrest her for trespass because she had been evicted. J.J. arrived and allowed D.L. 15 minutes to remove whatever she wanted from the mobile home.

"24.    At the May 19, 2011, hearing, the district court held that neither D.L. nor D.G. had a landlord-tenant relationship with South Meridian. Also, at that hearing, the respondent presented the testimony of the park manager, who testified that after the eviction case had been filed, she let C.K. into the mobile home to get some of her belongings.

"25.    After the district court issued its decision from the bench, the respondent proposed that he and Mr. Holmes get together to arrange for C.K. to get her personal belongings and to coordinate a time for D.L. to move the trailer out of the park. Mr. Holmes told the district court:

> 'We've been waiting for this to happen. I mean, I never have been communicated to once, as far as moving anything out, and [the manager]—she testified that after the eviction, she did let her in to go get clothes and personal property, and so we've never held any of this stuff up and—from day one, and that was from April 14th.'

"26.    Following the May 19, 2011, hearing, the respondent and Mr. Holmes agreed that C.K. and D.L. would have access to the mobile home on May 28, 2011, May 29, 2011, and May 30, 2011. In an order dated May 27, 2011, and filed at 10:59 a.m., the Court entered an order which memorialized the agreement between the parties.

> '1.    That pursuant to K.S.A. 58-35-103(l), the Court FINDS that [D.L.] and [D.G.] are not "Tenants", and the only tenant is the defendant, [C.K.].

6

'2.      The Court, in response to counsel's remarks that there was fraud on the Court, specifically FINDS that [neither] Plaintiff, nor Plaintiff's counsel presented any fraud to the Court and any allegations of such fraud are without merit.

'3.      The Court further FINDS that [C.K.] should make arrangements through Plaintiff or Plaintiff's counsel for purposes of removing any remaining personal property not already taken by Defendant after entering the home on 5/18/2011, or taken earlier with the consent of Plaintiff's manager.

'4.      The Court further FINDS that Defendant, [C.K.], and Intervener, [D.L.], have requested, and shall be allowed to enter the property between the hours of 8:00 a.m. and 5:00 p.m. on May 28, 29, and 30, 2001 [*sic*], for purposes of removing the personal property from the manufactured home . . . . Said entry will be coordinated by Plaintiff to allow Defendant and [D.L.] access during those times.

'5.      The Court further FINDS that Defendant, [C.K.], has no further tenancy rights and Plaintiff shall proceed with giving appropriate notice to have the mobile home removed.'

"27.      That same day, at 3:29 p.m., 4 1/2 hours after the Court entered the agreed order in the eviction case, the respondent filed a conversion action against J.J. and South Meridian on behalf of D.L., as D.G.'s attorney-in-fact. In the petition, the respondent alleged:

'9.      Notwithstanding Plaintiff's ownership of the mobile home, Defendants wrongfully denied Plaintiff entry to the home and have at all times denied Plaintiff access and entry to the mobile home. Plaintiff was denied access on May 18, 2011, and Defendant thereafter once more caused the locks on Plaintiff's mobile home to be changed, thereby reasserting Defendants' control and dominion over Plaintiff's

7

mobile home and preventing free entry to, and dominion of, the mobile home [by Plaintiff. On May 21, 2011, Plaintiff attempted to enter the mobile home,] with prior notice to Defendants, and again was turned away by the police under color of court order. At all times since April 15, 2011, Defendants have deprived Plaintiff access, control and dominion of her mobile home while obtaining control for Defendant, thereby converting the mobile home and its contents to the Defendants' own use.

'10.    Plaintiff has been denied the use of the mobile home from April 15, 2001 [*sic*] through the date of judgment at a reasonable value of $250.00 per month.

'11.    Defendants denied Plaintiff access to clothing, household items and personal property, thereby converting the same to Defendants' ownership and use. The value of personal property converted is in excess of $5,000.00.

'12.    In the event Defendants have not converted Plaintiff's personal property in the mobile home, then Plaintiff asserts that during Defendant's dominion of the mobile home, Defendants negligently failed to secure the mobile home resulting in loss and theft of Plaintiff's property.'

"28.    The petition made no reference to the order entered earlier that day.

"29.    On June 15, 2011, the defendants filed a motion to dismiss the conversion action. The court heard the motion on June 24, 2011. At that hearing, the district court denied the motion, finding that because the motion referenced matters outside the pleadings, the motion should have been filed as a motion for summary judgment. At the conclusion of the June 24, 2011, hearing, the district court also put the respondent on notice that there appeared to be no factual basis for the cause of action. The court warned the respondent that if no factual basis for the cause of action existed, the court would entertain a motion for sanctions under K.S.A. 60-211.

8

"30.     On July 1, 2011, the respondent filed a motion for summary judgment. On August 24, 2011, the court heard the respondent's motion for summary judgment. During the hearing, the respondent was unable to provide any legal authority that would support recovery of fair market value for the mobile home and its contents when that property was available to D.L. The court denied the respondent's motion for summary judgment, stating:

> 'I will, again, reiterate that it appears to me that the purpose of this lawsuit is not to recover personal property belonging to [D.G.]. It appears to be uncontroverted that that property remains on the real estate owned by the defendants, that the defendants do not want that property on their real estate, and it appears uncontroverted that the plaintiff apparently doesn't want possession of that stuff, either. What the plaintiff is trying to accomplish by way of this conversion action, apparently, is to force the defendants to buy, through some claim of conversion, the personal property that, for all intents and purposes, appears to be abandon[ed] on their property. And, as I mentioned before, I've not been provided with any law that stands for that proposition. And it sure seems to me, in the absence of any law or in the absence of some theory that the plaintiff can get from point A to point B on that issue, that this lawsuit has not been brought for a proper purpose. I referenced that earlier, and I'm referencing it again. It seems to me that this whole thing can be solved today—today if [D.G.] would hire somebody to move that mobile home off the defendants' property.'

"31.     After the ruling the from the bench, counsel for South Meridian reiterated that his client had no objection to the respondent's client moving the mobile home out of the park. The respondent told the district court that his client could not move the mobile home right away because she did not have a truck or the necessary permits. The district court told the respondent again that without some law to the contrary, a conversion claim cannot be made where it is the plaintiff's own inability to move the mobile home that is preventing her from taking possession of it.

9

"32.     On September 14, 2011, South Meridian filed a motion for summary judgment. On October 5, 2011, the court heard and granted South Meridian's motion for summary judgment. That same day, the respondent filed a notice that D.L. would move the mobile home from the park on the following day.

"33.     On October 26, 2011, South Meridian filed a motion for sanctions, under K.S.A. 60-211. In a memorandum decision filed January 5, 2012, the court granted the motion for sanctions, finding that the respondent violated K.S.A. 60-211(b) by filing the petition in the conversion action. The memorandum decision included the following:

'I.     Summary of the Court's Decision:

'Mr. Knopp violated K.S.A. 60-211(b) by filing the Petition in the instant case. The Court assesses a monetary sanction in the amount of $5,990.25.

. . . .

'IV.     Discussion:

'Analysis of the issue presented begins with a review of K.S.A. 60-211. K.S.A. 60-211(b) states:

'*Representation to the court.* By presenting to the court a pleading, written motion or other paper, whether by signing, filing, submitting or later advocating it, an attorney or unrepresented party certifies that to the best of the person's knowledge, information and belief formed after an inquiry reasonable under the circumstances:

(1)     It is not being presented for any improper purpose, such as to harass, cause unnecessary delay or needlessly increase the cost of litigation;

10

(2)     the claims, defenses and other legal contentions
are warranted by existing law or by a nonfrivolous
argument for extending, modifying or reversing existing
law or for establishing new law;

(3)     the factual contentions have evidentiary support
or, if specifically so identified, will likely have
evidentiary support after a reasonable opportunity for
further investigation or discovery; and

(4)     the denials of factual contentions are warranted
on the evidence or, if specifically so identified, are
reasonably based on belief or a lack of information.

When K.S.A. 60-211(b) is violated, the Court may impose a sanction
pursuant to K.S.A. 60-211(c) on the offending attorney or litigant. That
sanction "may include an order to pay to the other party or parties that
[*sic*] reasonable expenses, including attorney's fees, incurred because of
the filing of the pleading, motion or other paper." K.S.A. 60-211(c).

'Under K.S.A. 60-211, the claims of the party subject to
sanctions must be in '[a] pleading, motion or other paper.'" *In re
Marriage of Stockham*, 23 Kan. App. 2d 197, Syl. ¶ 2, 928 P.2d 104
(1997). "Under these provisions, sanctions are available only with regard
to papers filed with the court." *Id*.

'In this case, the Defendants argue in their motion that they are
entitled to sanctions pursuant to K.S.A. 60-211(c) "because of the
pleading filed by Plaintiff." Although the Defendants do not specifically
identify "the pleading filed by the Plaintiff" to which they refer,
Defendants[] allege that "the action filed by Plaintiff" was brought in

11

violation of K.S.A. 60-211. As such, the Court will confine its focus to the Petition filed by the Plaintiff in this case.

'Given the framework outlined above, the Court must look to the Petition filed by Mr. Knopp to first determine whether he violated K.S.A. 60-211(b). If a violation occurred, the Court must then determine what sanctions, if any, are appropriate.

'A.    Did Mr. Knopp violate K.S.A. 60-211(b)?

'In the present case, the Court finds that the Petition filed by Mr. Knopp violated K.S.A. 60-211(b). Specifically, the Court finds: (1) that the Plaintiff's claim for conversion was neither supported by facts, nor was such claim warranted by existing law; (2) that most of the damages Plaintiff claimed in the Petition were neither supported by the facts, nor were the recovery of such damages warranted by existing law; and (3) that the conversion lawsuit was not presented for any proper purpose. Each of these findings will be more fully addressed in turn.

'1.    Plaintiff's conversion claim was not supported by facts, nor was such claim warranted by existing law;

'In the Petition filed in the conversion case, Plaintiff alleges, among other things: (1) "Defendants wrongfully denied Plaintiff entry to the home and have at all times denied Plaintiff access and entry to the mobile home"; (2) "At all times since April 15, 2011, Defendants have deprived Plaintiff access, control and dominion of her mobile home while obtaining control for Defendant, thereby converting the mobile home and its contents to the Defendants' own use"; and (3) Defendants denied Plaintiff access to clothing, household items and personal property, thereby converting the same to Defendants' ownership and

12

use.[] These allegations are without a basis in fact, and have absolutely no evidentiary support.

'On the same day that Mr. Knopp filed the conversion case, he had obtained a court order in the forcible detainer case granting access for his client to the mobile home, from 8:00 a.m. to 5:00 p.m. on May 28, 29, and 30, 2011, for the express purpose of moving her property off the Defendants' mobile home park. The allegation in the Petition that Plaintiff was denied access and entry to the mobile home at all times since April 15, 2011, is unequivocally false. Not only does this allegation lack evidentiary support, but the uncontroverted evidence was the opposite of what Mr. Knopp alleged—the Plaintiff had _Court ordered access_ to her property.

'Moreover, at every court hearing in the forcible detainer case, the Defendants specifically stated through their attorney that they wanted Plaintiff to make arrangements to move the mobile home off the mobile home park. At the hearing on May 16, 2011, Mr. Holmes repeatedly stated that his clients had no objection to Plaintiff moving the mobile home out of its mobile home park, and indicated that such had been the position of his clients from the beginning. . . .

. . . .

'The numerous statements made by Defendants through their counsel that they wanted Plaintiff to move the mobile home out of the South Meridian mobile home park was known to Mr. Knopp before the conversion case was filed. In the face of these numerous statements, Mr. Knopp still alleged in the conversion Petition that the Plaintiff had at all times since April 15, 2011, been denied access and entry to the mobile home, that Plaintiff had been denied the use of the mobile home, and that Plaintiff had been denied access to clothing and household items. These

13

allegations were without any basis in fact and lack evidentiary support, and were made in violation of K.S.A. 60-211(b)(3). [citations omitted]

'Finally, nowhere in any of the pleadings in either the forcible detainer case or in the conversion case, nor at any hearing in either case, did Mr. Knopp identify *a single instance* where his client made a demand for return of the property. Further, no effort was made to coordinate the removal of Plaintiff's property from the mobile home park until after the conversion case was filed. The simple fact is that the Plaintiff was either unable or unwilling to move her property that was left at the mobile home park. By her failure to take any action whatever [*sic*] to remove this property, the Plaintiff put the Defendant in the position of being the unwilling custodian of the same.

'Not only was the Plaintiff's conversion claim wholly lacking any factual basis, but her claim was also not warranted by existing law. The Court permitted the Plaintiff to intervene in the forcible detainer action for the express purpose of allowing her the opportunity to prove that she has some kind of right to be on the South Meridian mobile home park by virtue of her ownership of the mobile home in question. The Court concluded at the end of the trial on that issue that Plaintiff had not established that she had any tenancy right which would entitle her to be at the mobile home park. The Plaintiff chose not to appeal this decision.

. . . .

'There is no legal authority to support the proposition that just because Plaintiff's mobile home is located on Defendants' private property the Plaintiff is entitled to enter on the property of the Defendants whenever she pleases without notice or prior consent of the Defendants. Likewise, there is no legal authority to support the proposition that just because the Defendants required the Plaintiff to get prior consent to enter their property that they were exercising or

14

assuming the right of ownership over the mobile home and its contents. The Plaintiff's conversion claim was not warranted by existing law, and was made in violation of K.S.A. 60-211(b)(2).

> '2. The damages sought by Plaintiff were neither supported by the facts nor were the recovery of such damages warranted by existing law:

'The damages that Plaintiff sought in the conversion action were itemized in the Petition as follows: (1) fair market value of the mobile home as of April 15, 2011; (2) fair market value of the personal property in the mobile home as of April 15, 2011, in an amount in excess of $5,000; (3) the costs of changing the locks in the amount of $300; (4) loss of the use of the mobile home in the amount of $500 per month from April 15, 2011, until the day of the judgment; and (5) a set-off against any lot rent claimed by the Defendants from and after April 15, 2011. Other than the damages for the changing of the locks and the request for set off, all other damages claimed by the Plaintiff lacked any factual basis or evidentiary support, and were not warranted by existing law. [footnote omitted]

'As noted above, all of this property was available to the Plaintiff—all she had to do was remove the property from the Defendants' mobile home park. As further noted above, the Plaintiff had a court order which granted her access to the Defendants' property for the express purpose of removing her property. At the time the Petition for conversion was filed, the property was available to the Plaintiff, and could have been retrieved by the Plaintiff on the dates provided in the court's order. The Plaintiff's damage claim for the fair market value of property that was available to be pick [*sic*] up lacked any basis in fact and was unsupported by any evidence, in violation of K.S.A. 60-211(b)(3).

15

'With regard to the damages for loss of use of the mobile home, Mr. Knopp admitted at the hearing on August 24, 2011, that his client did not have a truck large enough to move the mobile home, and did not have the requisite permits to move the mobile home. When pressed by the Court for a time frame within which the Plaintiff could remove the mobile home from the South Meridian mobile home park, Mr. Knopp stated: "I wouldn't know, You [*sic*] Honor. I just am not in a position to say."

'Accordingly, at the time the conversion action was filed seeking damages in the amount of $500 per month for loss of use of the mobile home, the Plaintiff had been told by the Court in the forcible detainer action that she had no rights of tenancy that would permit her to reside at the mobile home park. As such, the Plaintiff was unable to make use of the mobile home as a residence until after she moved it off the South Meridian mobile home park, but she lacked the means of removing the mobile home. The fact that Plaintiff was unable to make use of the mobile home as a residence is completely unrelated to any action that the Defendants took towards the mobile home.

'Moreover, it is important to note that the Plaintiff did, in fact, make use of the mobile home—since she refused to remove her personal property from the mobile home, the mobile home served as a storage facility for her personal property, for which Plaintiff paid Defendants no lot rent. The Plaintiff's damage claim for loss of use of the mobile home had no basis in fact and did not have evidentiary support, and was in violation of K.S.A. 60-211(b)(3).

'Finally, in light of the fact that Plaintiff had a court order permitting her access to the South Meridian mobile home park to remove her property, the Court specifically asked Mr. Knopp to articulate the damages that Plaintiff had suffered on the date she filed her conversion Petition. The only damages that Mr. Knopp could articulate were

16

nominal damages associated with the changing of the locks on the mobile home. The fact that Mr. Knopp was unable to articulate damages beyond nominal damages after he prepared and filed a Petition, after he prepared and filed a motion for summary judgment, and after he prepared and filed a memorandum in opposition to Defendants' motion for summary judgment indicates that the damages claimed by Plaintiff would not likely have evidentiary support after a reasonable opportunity for discovery. [footnote omitted]

'Not only were the damage claims discussed above without any basis in fact, but they were also not warranted by existing law in violation of K.S.A. 60-211([b])(2). In each case cited by the Plaintiff where the fair market value of converted property was recovered, it was in circumstances where the converted property had either been sold or disposed of. Plaintiff's counsel cited no legal authority that would permit his client to recover the fair market value of the mobile home and its contents when that property had not been disposed of and was available to the Plaintiff.

'3.     The conversion lawsuit was not brought for any proper purpose:

'As shown above, this conversion lawsuit was not brought by the Plaintiff in order to recover her property from the South Meridian mobile home park. The Plaintiff had a court order in hand granting her access to the mobile home park to recover her property, but she did not have the means available to move her mobile home from the mobile home park. The purpose of this action was an effort by the Plaintiff to force the Defendants to purchase her mobile home and its contents—property that, for all intents and purposes, had been abandoned by the Plaintiff. As a result, despite the fact that the tenant of the mobile home had been evicted in April of 2011, the removal of the mobile home from Defendants' mobile home park was unnecessarily delayed until October

17

of 2011. In the meantime, the Defendants not only incurred the loss of lot rent, but also incurred significant legal costs to defend against a frivolous lawsuit.

'Mr. Knopp was advised early in the litigation of the conversion claim—at the hearing on Defendants' motion to dismiss—that the Court was of the opinion that there appeared to be no factual basis for the Plaintiff's claim and that he risked sanctions pursuant to K.S.A. 60-211(c). At that point, rather than simply making arrangements to retrieve Plaintiff's property and dismiss the case, Mr. Knopp responded by filing a motion for summary judgment, which accomplished nothing except to increase the costs of defense to the Defendants.

'At the hearing on Plaintiff's motion for summary judgment, Mr. Knopp was again advised by the Court "that this lawsuit has not been brought for a proper purpose." Mr. Knopp was advised by Mr. Holmes that there was no objection by the Defendants to the removal of Plaintiff's property from their mobile home park. Mr. Knopp was further advised by the Court that if the Plaintiff "wants to maintain this action for conversion, whether or not she goes and gets that mobile home, she does it at her own risk." Again, Mr. Knopp elected to continue on with the lawsuit, forcing the Defendants to incur costs preparing their own summary judgment motion.

'This lawsuit was not brought for any proper purpose. Mr. Knopp was given numerous opportunities to end the lawsuit while at the same time securing the return of his client's property from the mobile home park. The dogged pursuit by Mr. Knopp of a claim that had no merit in order to recover damages that have no merit needlessly increased the costs of litigation for the Defendants. The initiation and pursuit of the conversion claim was in violation of K.S.A. 60-211(b)(1).

18

'B.     What sanctions are appropriate:

. . . .

'Mr. Knopp's conduct was willful. At the conclusion of the trial in the forcible detainer action on May 19, 2011, Mr. Knopp stated to the Court: "I would propose we coordinate with [Mr. Holmes] to—for [Plaintiff's] presence, if she intends to be [at the mobile home park] without living there. And, other than that, we'll also coordinate when a trailer or tractor is getting ready to move that trailer out of the park." Mr. Knopp then signed and approved the court order in the forcible detainer action granting Plaintiff access to South Meridian mobile home park, which was filed with the court on May 27, 2011, at 10:59 a.m. Four and a half hours later, at 3:29 p.m., Mr. Knopp filed the conversion Petition alleging that his client had been denied access and entry to the mobile home.

'It is obvious from this time line that Mr. Knopp was negotiating arrangements for his client to remove her property from the Defendants' mobile home park at the same time he was preparing a lawsuit accusing the Defendants of denying his client access to this same property. That is not negligent conduct. There is no way that Mr. Knopp could have been mistaken about whether or not his client had access to her property when he filed the conversion Petition.

. . . .

'Mr. Knopp's conduct at issue here was not an isolated event. It was part of a pattern of activity that began in the forcible detainer action in which Mr. Knopp filed a pleading with the Court that was intentionally deceptive. In the forcible detainer action, Mr. Knopp filed a motion on behalf of the tenant [C.K.] to set aside the default judgment that had been entered against her. In that motion, he asserted that [C.K.]

19

had, in fact paid the back rent in full within the three day period of the notice to quit, and accused Mr. Holmes of committing a fraud on the Court. [footnote omitted] Eventually, [C.K.] would testify that she delivered a partial payment of the back rent ($400) on April 6th, and that when she delivered the balance of the back rent on April 7th she discovered that the previous partial rent payment had already been returned by the landlord. [footnote omitted] [C.K.] testified that she did not tender the $400 back to the landlord after it had been returned. Consequently, the uncontroverted facts were that at no time was the landlord ever in receipt of the full amount of the rent.

'In regards to the allegations of fraud on the court, Mr. Knopp omitted from the allegations [*sic*] his motion to set aside the default judgment that the initial $400 partial payment had been returned by the Defendant *before* the second partial payment was made. As such, the motion filed by Mr. Knopp left the Court with the false impression that: (1) a three day notice was served specifying back rent due of $495; (2) the tenant paid the rent in full within that three day period in two payments made on April 6 and 7; (3) that the *full* tender of rent was returned by the landlord on April 7; and (4) that despite full tender of rent within the 3 day period, a Petition was filed by Mr. Holmes which fraudulently alleged non-payment of rent by the tenant in order to "avoid the statutory provisions for terminating a manufactured home rental arrangement."

'Intentionally omitting material facts from a motion which accuses another attorney of fraud on the court is no small matter. Fraud on the court is a serious allegation.

        . . . .

'An allegation of fraud on the court directed at another attorney not only calls into question the integrity of the judicial process, but also the ethical fitness of the attorney subject to the allegation. . . .

'In the forcible detainer case, the Court expressly found that no fraud on the court had been committed by Mr. Holmes:

. . . .

'Separate and apart from the baseless allegation of fraud on the court, Mr. Knopp exhibited a general pattern of acting in bad faith throughout the forcible detainer action. At the conclusion of the hearing on May 16, 2011, the Court stated to Mr. Knopp:

"I'm going to leave it to you and Mr. Holmes to work out the details on access to the mobile home, to move personal property, access to the mobile home for purposes of, you know, disconnecting utilities and making sure that any assets that are subject to dissipation and waste . . . are preserved, and so forth?"

'Despite this admonition from the Court, Mr. Knopp advised his client to go out to the mobile home park on May 18, 2011, and access the mobile home without notifying Mr. Holmes or the Defendants. . . .

. . . .

'Consequently, as a result of Mr. Knopp's failure [*sic*] act in a [*sic*] good faith with Mr. Holmes to coordinate access to the mobile home park, a public disturbance occurred, the police were called and were at the property for four hours, and the tenant who had previously been evicted from the property was back on the property. To add insult to injury, Mr. Knopp alleged in the conversion Petition that the incident on

21

May 18 was an example of his client being wrongfully denied access and entry to the mobile home. At the conclusion of the hearing on May 19, the Court [again] admonished the parties to coordinate a time for the removal of Plaintiff's property from the mobile home park:

. . . .

'Despite this admonition, for whatever reason Mr. Knopp refused to work with Mr. Holmes to arrange for a time to have property removed from the mobile home park. Mr. Knopp's client again went to the mobile home park on May 21, 2011, without making a reasonable effort to coordinate her presence at the mobile home park with the Defendants. [footnote omitted] As the Court predicted, the police were again called (apparently by neighbors), and once again the simple act of removing property from the mobile home turned into a public disturbance. . . .

. . . .

'The amount necessary to deter similar activity in future litigation requires, at a minimum, that the Defendants be made whole for the economic loss occasioned by this lawsuit. As noted above, this action delayed removal of the mobile home from the South Meridian mobile home park. Defendants should recover $860 for lot rent from June through September. Further, Defendants should recover $5,130.25 for the attorney fees and expenses incurred in the defense of this case. The total amount necessary to deter similar conduct in future cases is $5,990.25.

. . . .

'The Petition filed by Mr. Knopp in this case violated K.S.A. 60-211(b). Based upon the relevant factors addressed above, the Court sanctions Mr. Knopp in the amount of $5,990.25. This Memorandum Opinion shall serve as the Journal Entry of Judgment.'

22

"34. On January 12, 2012, the respondent self-reported his misconduct by providing the disciplinary administrator's office with a copy of the memorandum decision.

"35. On behalf of D.G. and D.L., the respondent appealed the district court's orders denying their motion for summary judgment, granting South Meridian's motion for summary judgment, and granting South Meridian's motion for sanctions.

"36. In an unpublished opinion dated February 15, 2013, the Kansas Court of Appeals affirmed the lower court's judgment, including the imposition of sanctions. *[D.L.], et al. v. South Meridian Park, LLC, et al.*, No. 107,586. South Meridian filed a motion for attorney fees on appeal. Initially, the Kansas Court of Appeals denied the motion. Upon reconsideration, the Kansas Court of Appeals granted South Meridian's motion for attorney fees and ordered the respondent to pay an additional $7,367.50 for attorney fees rendered by South Meridian's attorneys on appeal.

"*Conclusions of Law*

"37. Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 3.1, KRPC 3.3(a)(1), KRPC 8.4(c), KRPC 8.4(d), and KRPC 8.4(g), as detailed below.

"KRPC 3.1

"38. Attorneys shall not file frivolous cases. In that regard, KRPC 3.1 specifically provides:

'A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law. A lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result

23

in incarceration, may nevertheless so defend the proceeding as to require that every element of the case be established.'

The respondent filed a frivolous case when he filed the conversion action. Accordingly, the hearing panel concludes that the respondent violated KRPC 3.1.

"KRPC 3.3(a)(1)

"39.     KRPC 3.3(a)(1) provides that '[a] lawyer shall not knowingly make a false statement of material fact or law to a tribunal.' The respondent made false statements of material fact to the Court when he asserted in his motion to set aside default judgment that C.K. had paid the back rent in full within the 3-day period of the notice to quit. The uncontroverted facts were that at no time was the landlord ever in receipt of the full amount of the rent. Further, the respondent made false statements of material fact to the court in the conversion petition when he included statements that D.L. did not have access to her property. The respondent knew that D.L. had court ordered access. Because the respondent provided false information to the Court, the hearing panel concludes that the respondent violated KRPC 3.3(a)(1).

"KRPC 8.4(c)

"40.     'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent engaged in conduct that involved dishonesty when he provided false information to the court in the motion to set aside default judgment in the forcible detainer case that C.K. had timely tendered full payment of the back rent and in the conversion petition that D.L. did not have access to her property. As such, the hearing panel concludes that the respondent violated KRPC 8.4(c).

"KRPC 8.4(d)

"41.     'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). The respondent engaged in

24

conduct that was prejudicial to the administration of justice when he filed a frivolous lawsuit and later, a frivolous appeal. As such, the hearing panel concludes that the respondent violated KRPC 8.4(d).

"KRPC 8.4(g)

"42.     'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). The respondent engaged in conduct that adversely reflects on his fitness to practice law when he advised D.L. to enter South Meridian mobile home park on May 18, 2011, without authorization. As a result, a public disturbance resulted, necessitating the presence of law enforcement for a period of 4 hours. The hearing panel concludes that the respondent violated KRPC 8.4(g).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"43.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"44.     *Duty Violated.*  The respondent violated his duty to the public to maintain his personal integrity. Further, the respondent violated his duty to the legal system to refrain from abusing the legal process.

"45.     *Mental State.*  The respondent knowingly and intentionally violated his duties. However, the evidence indicates that the respondent was motivated by a genuine desire to assist his client and his desire was complicated by his narcissism and obsessive-compulsive personality as described in paragraphs 54 and 58 below.

25

"46.    *Injury*. As a result of the respondent's misconduct, the respondent caused actual injury to the legal system, to South Meridian, and to the legal profession.

"Aggravating and Mitigating Factors

"47.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"48.    *Dishonest Motive*.  The respondent engaged in dishonest conduct when he included false statements in the motion to set aside the default judgment and in the conversion petition. While the conduct appears to be motivated by dishonesty, again, the evidence indicates that the respondent was motivated in part by a genuine desire to assist his client and this desire was complicated by his narcissism and obsessive-compulsive personality to be right as described in paragraphs 54 and 58 below.

"49.    *A Pattern of Misconduct*.  The respondent engaged in a pattern of bad faith and conduct which was intentionally deceptive, as thoroughly addressed by the district court in its memorandum decision. The respondent included false statements of material fact in the motion to set aside the default judgment in the forcible detainer case. The respondent advised his client to go to the mobile home without first obtaining permission from South Meridian, resulting in a public disturbance. The respondent filed a frivolous lawsuit which included false statements of material fact that his client was denied access to her property, less than 5 hours after an agreed order was entered granting his client court ordered access to her property. The respondent's pattern of misconduct in this case resulted in serious prejudice to the administration of justice for an extended period of time.

"50.    *Multiple Offenses*.  The respondent committed multiple rule violations. The respondent violated KRPC 3.1, KRPC 3.3, KRPC 8.4(c), KRPC 8.4(d), and KRPC 8.4(g). Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

26

"51.     *Substantial Experience in the Practice of Law.*  The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1982. At the time of the misconduct, the respondent has been practicing law for nearly 30 years.

"52.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"53.     *Absence of a Prior Disciplinary Record.*  The respondent has not previously been disciplined.

"54.     *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct.*  The respondent has relevant personality traits of narcissism, obsessive-compulsive personality, and histrionic features. The respondent's psychologist stated that although the personality traits are 'pronounced, none are diagnosed as severe and no mental disorder is indicated.' The psychologist also stated that the 'characteristics [] likely provoke his bull headedness and need to be right, even with opposition from an authority.' Thus, it appears to the hearing panel that the respondent's personality traits contributed to the misconduct. The respondent's personality traits have also led to difficulties in his personal life for which he has sought and obtained counseling.

"55.     *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.*  The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts that gave rise to the violations.

"56.     *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney.*  The respondent is an active and productive member of the bar of Wichita, Kansas. The respondent also enjoys the respect of his peers and generally

27

possesses a good character and reputation as evidenced by several letters received by the hearing panel.

"57.    *Imposition of Other Penalties or Sanctions*.  The district court ordered the respondent to pay nearly $6,000 and the Kansas Court of Appeals ordered the respondent to pay over $7,000. The respondent has satisfied the sanctions ordered by both courts.

"58.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'6.12    Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.'

"*Recommendation*

"59.    The disciplinary administrator recommended that the respondent be suspended for a period of 90 days. The disciplinary administrator further recommended that the suspension be stayed and that the respondent be placed on probation for a period of 2 years. Despite the fact that the respondent provided a timely plan of probation and despite the disciplinary administrator's recommendation that the respondent be placed on probation, counsel for the respondent recommended that the respondent be censured by the Kansas Supreme Court.

"60.    In the disciplinary administrator's closing argument, she commented that she questioned whether the respondent, 'gets it.' The hearing panel shares her concern that the respondent does not appear to fully understand and appreciate the seriousness of his misconduct. In the underlying case, the respondent let his tunnel vision get in the way of a reasoned response to the eviction matter.

28

"61.    Interestingly, one of the respondent's supporters, W. Thomas Gilman, noted conduct of a similar, but less extreme, nature:

'In the thirty years that I have practiced law, I have had several cases against Mr. Knopp. I have seen him do good work for his clients. I have, however, observed that he has a tendency to over-complicate cases, sometimes taking an overly technical or impractical tact when a simple solution seemed apparent to me. He has never been untruthful with me and I have never seen him be untruthful to any court in which we appeared. I believe Ted has good intentions and wants to be a zealous advocate for his clients, but sometimes gets muddled up over-evaluating a case. I believe he is an asset to our bar here in Wichita and south-central Kansas.'

The hearing panel observed the truth of these remarks and agrees with much of what Mr. Gilman stated, including the statement that the respondent is an asset to the bar. In this case, also, he certainly over-complicated a simple case. Unlike the circumstances that Mr. Gilman referenced, the respondent crossed the line of zealous advocacy and made dishonest statements to the court in the motion to set aside the default judgment and in the conversion petition. During this testimony, the respondent sincerely acknowledged the truth of the criticisms noted by Mr. Gilman. Mr. Gilman's letter appears to have positively motivated the respondent to self-examine what he had done and accept the fact that his own personality led him to engage in unacceptable behavior. The hearing panel is troubled by the respondent's dishonest conduct, but is encouraged by his self-examination and willingness to seek and accept help.

"62.    That aside, because the respondent timely filed a request for probation, the hearing panel must first consider whether probation is appropriate in this case. The hearing panel turns to Kan. Sup. Ct. R. 211(g), which provides, in pertinent part, as follows:

29

'Requirements of Probation

'(1)     If the Respondent intends to request that the Respondent be placed on probation for violating the Kansas Rules of Professional Conduct or the Kansas Supreme Court Rules, the Respondent shall provide each member of the Hearing Panel and the Disciplinary Administrator with a workable, substantial, and detailed plan of probation at least fourteen days prior to the hearing on the Formal Complaint. The plan of probation must contain adequate safeguards that will protect the public and ensure the Respondent's full compliance with the disciplinary rules and orders of the Supreme Court.

'(2)     If the Respondent provides each member of the Hearing Panel and the Disciplinary Administrator with a plan of probation, the Respondent shall immediately and prior to the hearing on the Formal Complaint put the plan of probation into effect by complying with each of the terms and conditions of the probation plan.

'(3)     The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)     the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii)     the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

30

> > (iii) the misconduct can be corrected by probation; and
>
> > (iv) placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

Thus, in order for the hearing panel to consider recommending to the Supreme Court that the respondent be placed on probation, the hearing panel must first find each of the elements in Kan. Sup. Ct. R. 211(g)(3).

"63. In this case, the respondent developed a workable, substantial, and detailed plan of probation and provided a copy of the proposed plan of probation to the disciplinary administrator and each member of the hearing panel at least fourteen days prior to the hearing on the Formal Complaint. Further, the respondent put the proposed plan of probation into effect prior to the hearing on the formal complaint by complying with each of the terms and conditions of the probation plan. With the supervision proposed, it appears that the misconduct can be corrected by probation. The hearing panel believes that supervision of the respondent's practice is necessary. Finally, at this time, it appears that it is in the best interest of the legal profession and the citizens of the State of Kansas to recommend probation at this time. The hearing panel is confident that Joseph Knopp, as the respondent's proposed practice supervisor, will assist the respondent in determining simple solutions for the respondent's cases.

"64. Thus, the hearing panel unanimously recommends that the Supreme Court suspend the respondent's license to practice law for a period of 90 days. But, the hearing panel further recommends that the Supreme Court suspend the imposition of the suspension and place the respondent on probation for a period of two years, subject to the terms and conditions detailed below:

> '1. *Practice Supervision.* Joseph Knopp shall serve as the respondent's practice supervisor. For the first 18 months of probation, the

31

respondent shall meet with the practice supervisor on a monthly basis. For the final 6 months of probation, the respondent shall meet with the practice supervisor as directed by the practice supervisor. During each meeting, the respondent shall inform the practice supervisor of all cases opened since their last meeting and the status of each case. The respondent shall inform the practice supervisor of any events, issues, and problems experienced or expected in the pending cases, to include any warnings by courts that the respondent's case appears to lack factual or legal support. Further, the respondent shall provide the practice supervisor with an updated copy of the inventory of cases and clients, as detailed below, on a monthly basis. The respondent shall allow the practice supervisor access to his client files, computer, calendar, and trust account records. The respondent shall comply with any requests made by the practice supervisor. During the first 18 months of probation, the practice supervisor shall provide the disciplinary administrator and the respondent a monthly report regarding the respondent's status on probation. During the final 6 months of probation, the practice supervisor shall provide the disciplinary administrator and the respondent with quarterly reports. The respondent shall follow all recommendations and correct all deficiencies noted in the practice supervisor's periodic reports. The practice supervisor will be acting as an officer and an agent of the court while supervising the probation and monitoring the respondent's legal practice. As supervising attorney, the practice supervisor shall be afforded all immunities granted by Kan. Sup. Ct. R. 223 during the course of his supervising activities.

'2. *Inventory of Cases and Clients.* Within 10 days of this report, the respondent shall make an inventory of all open cases and clients. The respondent shall update the inventory on a daily basis. The inventory shall include the client's name, the client's contact information, the client's goal, the tasks that remain to be completed, all pending deadlines, and the forum (if any) in which the matter is pending.

'3.     *Audits*. Within 30 days of the date of this report, the practice supervisor shall conduct an initial audit of the respondent's files to confirm the factual and legal basis for claims and defenses asserted. Then, 60 days later, the practice supervisor shall conduct a second audit of the respondent's files. Thereafter, the practice supervisor shall conduct additional audits every 90 days. At the conclusion of the period of probation, the practice supervisor shall conduct a final audit of the respondent's files. If the practice supervisor discovers any violations of the Kansas Rules of Professional Conduct, the practice supervisor shall include such information in his report. The practice supervisor shall provide the disciplinary administrator and the respondent with a copy of each audit report. The respondent shall follow all recommendations and correct all deficiencies noted in the practice supervisor's periodic audit reports.

'4.     *Pro Bono Cases*. The respondent shall not provide *pro bono* services without prior approval of the practice supervisor and after a thorough discussion of the means of attempting to reach the client's goal.

'5.     *Nature of Cases.* The respondent shall not accept cases that have a low probability of success and are without a clearly established means of attempting to reach the client's goal.

'6.     *Psychological Treatment*. The respondent shall continue his regular treatment with Thomas T. Graff, Ph.D., throughout the period of supervised probation, unless the psychologist determines that continued treatment is no longer necessary. The psychologist shall notify the practice supervisor and the disciplinary administrator in the event that the respondent discontinues treatment against the recommendation of the psychologist during the probationary period. The respondent shall forthwith provide the psychologist with an appropriate release of

33

information to allow the psychologist to provide such information to the practice supervisor and the disciplinary administrator.

'7.      *Continued Cooperation*. The respondent shall continue to cooperate with the disciplinary administrator. If the disciplinary administrator requests any additional information, the respondent shall timely provide such information.

'8.      *Additional Violations*. The respondent shall not violate the terms of his probation or the provisions of the Kansas Rules of Professional Conduct. In the event that the respondent violates any of the terms of probation or any of the provisions of the Kansas Rules of Professional Conduct at any time during the probationary period, the respondent shall immediately report such violation to the practice supervisor and the disciplinary administrator. The disciplinary administrator shall take immediate action directing the respondent to show cause why the probation should not be revoked.

'9.      *Release from Probation*. The respondent will remain on probation until the respondent seeks and obtains a release from probation by the Supreme Court, pursuant to Kan. Sup. Ct. R. 211(g)(7).'

"65.      Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, the discipline that should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2015 Kan. Ct. R. Annot. 350).

34

Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

Respondent was given adequate notice of the formal complaint, to which he filed an answer. Respondent was also given adequate notice of the hearing before the panel and the hearing before this court. He filed no exceptions to the hearing panel's final hearing report. With no exceptions before us, the panel's findings of fact are deemed admitted. Supreme Court Rule 212(c), (d) (2015 Kan. Ct. R. Annot. 369). Further, the evidence before the hearing panel establishes the charged misconduct in violation of KRPC 3.1 (2015 Kan. Ct. R. Annot. 592) (meritorious claims and contentions); 3.3(a)(1) (2015 Kan. Ct. R. Annot. 601) (candor toward tribunal); 8.4(c) (2015 Kan. Ct. R. Annot. 672) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); 8.4(d) (engaging in conduct prejudicial to the administration of justice); and 8.4(g) (engaging in conduct adversely reflecting on lawyer's fitness to practice law) by clear and convincing evidence, which supports the panel's conclusions of law. We therefore adopt the panel's findings and conclusions.

The only remaining issue before us is the appropriate discipline for respondent's violations. At the panel hearing, at which the respondent appeared, the office of the Disciplinary Administrator recommended that the respondent be suspended for a period of 90 days, that imposition of the suspension be stayed, and that respondent be placed on probation for a period of 2 years. Respondent recommended published censure; alternatively, respondent submitted a proposed probation plan. The hearing panel recommended that the respondent be suspended for 90 days, that imposition of the suspension be stayed, and that the respondent be placed on probation for a period of 2 years subject to the following terms and conditions:

1.    *Practice Supervision.* Joseph Knopp shall serve as the respondent's practice supervisor. For the first 18 months of probation, the respondent shall meet with the practice supervisor on a monthly basis. For the final 6 months of probation, the respondent shall meet with the practice supervisor as directed by the practice supervisor. During each meeting, the respondent shall inform the practice supervisor of all cases opened since their last meeting and the status of each case. The respondent shall inform the practice supervisor of any events, issues, and problems experienced or expected in the pending cases, to include any warnings by courts that the respondent's case appears to lack factual or legal support. Further, the respondent shall provide the practice supervisor with an updated copy of the inventory of cases and clients, as detailed below, on a monthly basis. The respondent shall allow the practice supervisor access to his client files, computer, calendar, and trust account records. The respondent shall comply with any requests made by the practice supervisor. During the first 18 months of probation, the practice supervisor shall provide the Disciplinary Administrator and the respondent a monthly report regarding the respondent's status on probation. During the final 6 months of probation, the practice supervisor shall provide the Disciplinary Administrator and the respondent with quarterly reports. The respondent shall follow all recommendations and correct all deficiencies noted in the practice supervisor's periodic reports. The practice supervisor will be acting as an officer and an agent of the court while supervising the probation and monitoring the respondent's legal practice. As supervising attorney, the practice supervisor shall be afforded all immunities granted by Rule 223 (2015 Kan. Ct. R. Annot. 420) during the course of his supervising activities.

2.      *Inventory of Cases and Clients.* Within 10 days of this report, the respondent shall make an inventory of all open cases and clients. The respondent shall update the inventory on a daily basis. The inventory shall include the client's name, the client's contact information, the client's goal, the tasks that remain to be completed, all pending deadlines, and the forum (if any) in which the matter is pending.

3.      *Audits*. Within 30 days of the date of this report, the practice supervisor shall conduct an initial audit of the respondent's files to confirm the factual and legal basis for claims and defenses asserted. Then, 60 days later, the practice supervisor shall conduct a second audit of the respondent's files. Thereafter, the practice supervisor shall conduct additional audits every 90 days. At the conclusion of the period of probation, the practice supervisor shall conduct a final audit of the respondent's files. If the practice supervisor discovers any violations of the Kansas Rules of Professional Conduct, the practice supervisor shall include such information in his report. The practice supervisor shall provide the Disciplinary Administrator and the respondent with a copy of each audit report. The respondent shall follow all recommendations and correct all deficiencies noted in the practice supervisor's periodic audit reports.

4.      *Pro Bono Cases*. The respondent shall not provide *pro bono* services without prior approval of the practice supervisor and after a thorough discussion of the means of attempting to reach the client's goal.

5. *Nature of Cases.* The respondent shall not accept cases that have a low probability of success and are without a clearly established means of attempting to reach the client's goal.

6. *Psychological Treatment.* The respondent shall continue his regular treatment with Thomas T. Graff, Ph.D., throughout the period of supervised probation, unless the psychologist determines that continued treatment is no longer necessary. The psychologist shall notify the practice supervisor and the Disciplinary Administrator in the event that the respondent discontinues treatment against the recommendation of the psychologist during the probationary period. The respondent shall forthwith provide the psychologist with an appropriate release of information to allow the psychologist to provide such information to the practice supervisor and the Disciplinary Administrator.

7. *Continued Cooperation.* The respondent shall continue to cooperate with the Disciplinary Administrator. If the Disciplinary Administrator requests any additional information, the respondent shall timely provide such information.

8. *Additional Violations.* The respondent shall not violate the terms of his probation or the provisions of the Kansas Rules of Professional Conduct. In the event that the respondent violates any of the terms of probation or any of the provisions of the Kansas Rules of Professional Conduct at any time during the probationary period, the respondent shall immediately report such violation to the practice supervisor and the Disciplinary Administrator. The Disciplinary

Administrator shall take immediate action directing the respondent to show cause why the probation should not be revoked.

9. *Release from Probation*. The respondent will remain on probation until the respondent seeks and obtains a release from probation by the Supreme Court, pursuant to Rule 211(g)(7) (2015 Kan. Ct. R. Annot. 350).

At the hearing before this court, the Deputy Disciplinary Administrator stated that the respondent had completed nearly 2 years of probation successfully, including obtaining the required psychological treatment. She also emphasized that respondent had fully cooperated with the disciplinary process, had paid the sanctions levied by the court promptly, and had an excellent reputation. Although the applicable ABA standards called for suspension, she said, she believed that mitigating factors and respondent's success on probation so far meant that a 90-day suspension, whose imposition would be stayed, with continued probation on the panel's terms for 6 months would be enough to punish the uncontested violations and protect the public.

Counsel for respondent argued that the ABA standards calling for suspension should not apply, given the low probability that any of respondent's misstatements to the court would ever have been relied upon to support a ruling, and sought to limit discipline to a published censure. In the event the court disagreed with this analysis, counsel said that probation, particularly consultation with respondent's practice adviser, had been helpful to the respondent in assessing the strength of his legal positions in cases.

The court appreciates respondent's counsel's point that not all misrepresentations to courts are created equal. Some turn out to be more consequential than others. That said, the exact degree of harm cannot be gauged with 100 percent accuracy when a

misrepresentation is made. And each is, in itself, a serious matter that undercuts the overall reliability of our justice system. For this reason, the court believes that a 90-day period of suspension is an appropriate sanction in this case; however, imposition of the suspension will be stayed, pending respondent's successful completion of an additional 6 months of probation under all of the remaining applicable terms set out by the hearing panel.

A minority of the court would impose a lesser sanction.

As set forth in the panel's probation conditions and acknowledged by the Deputy Disciplinary Administrator in her remarks at the hearing before this court, at the conclusion of the 6 months, respondent must file a motion for release from probation.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Ted E. Knopp be and is hereby disciplined by a 90-day suspension from the practice of law, with imposition of the suspension stayed pending successful completion of 6 months of probation under all of the remaining applicable terms set out by the hearing panel. See Supreme Court Rule 203(a)(2), (5) (2015 Kan. Ct. R. Annot. 293).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.